UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT WILLIAMS,

                Plaintiff,

-v-

ALLIED BARTON SECURITY SERVICES,

                Defendant.



No. 16-cv-8047 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

    Plaintiff Robert Williams ("Plaintiff"), proceeding *pro se*, brings this action against his former employer, Allied Barton Security Services ("Allied Barton" or "Defendant"), alleging that Defendant wrongfully terminated his employment on the basis of racial discrimination, age discrimination, and unlawful retaliation in violation of federal, state, and local civil rights laws. Now before the Court is Defendant's motion for summary judgment. For the reasons that follow, Defendant's motion is GRANTED.

I. BACKGROUND

A. Facts[1]

    Allied Barton provides security services to customers located throughout the United States, principally placing security officers at clients' places of operations. (Def. 56.1 ¶ 1.) On or about August 1, 2014, Allied Barton hired Plaintiff, an African American male in his early fifties, as a

---

[1] The following facts are drawn from Defendant's Local Civil Rule 56.1 Statement (Doc. No. 45 ("Def. 56.1")) and Plaintiff's Local Civil Rule 56.1 Counter-Statement (Doc. No. 55 ("Pl. 56.1")). Unless otherwise noted, where only one party's 56.1 Statement or Counter-Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In resolving the motions, the Court also considered Defendant's memorandum of law in support of its motion for summary judgment (Doc. No. 43 ("Mem.")), Plaintiff's memorandum of law in opposition to the motion for summary judgement and the attached statement of facts (Doc. No. 49 ("Opp.")), and Defendant's reply brief (Doc. No. 51 ("Reply")).

"shift supervisor" stationed at the mall at Bay Plaza, located in the Bronx, New York. (*Id.* ¶¶ 3, 4; Opp. ¶ 1; Doc. No. 46-1 at 146:19–147:1.) Scott Carpenter, Allied Barton's account manager, supervised Plaintiff throughout his period of employment. (Def. 56.1 ¶ 5.) Alex Diaz, Allied Barton's assistant account manager, also supervised Plaintiff, although Plaintiff generally reported directly to Carpenter. (Doc. No. 46-1 at 80:8–18.)

On June 21, 2015, the fire alarm at the Olive Garden located in the mall at Bay Plaza began malfunctioning, and Plaintiff responded to the scene.[2] (Def. 56.1 ¶ 9.) While the facts surrounding the Olive Garden incident are in dispute, the parties agree that Alex Diaz, who also responded to the scene, purported to fire Plaintiff for his behavior in managing the situation. (*Id.* ¶ 10; Pl. 56.1 ¶¶ 9, 10.) Plaintiff immediately called Scott Carpenter, who instructed him to go home so that Carpenter could "investigate the situation." (Def. 56.1 ¶ 11.) The next day, Plaintiff called the "Security Voice Hotline" to lodge a complaint that Diaz had discriminated against him because of his race and had subjected him to unlawful verbal harassment and unfair disciplinary action. (*Id.* ¶ 13.) On June 23, 2018, Carpenter concluded that "the situation [at Olive Garden] did not warrant termination[;]" however, Carpenter issued a "Final Written Warning" to Plaintiff for "knowingly refus[ing] an order from his supervisor while having a full understanding of the chain of command."[3] (*Id.* ¶ 12; Doc. No. 46-4.)

---

[2] Although the parties state in their respective 56.1 statements that the incident occurred on June 2, 2018, both Plaintiff – in his affidavit in support of the "Charge of Discrimination" that he submitted to the Equal Employment Opportunity Commission – and Carpenter – in his declaration submitted in support of Defendant's motion – assert that the incident occurred on June 21, 2018. (*See* Doc. No. 46-3 ¶ 5; Doc. No. 44 ¶ 5.) Accordingly, the Court assumes that the incident occurred on June 21, 2018, but whether it was on June 2, 2018 or June 21, 2018 is not material to the Court's resolution of this motion.

[3] While Plaintiff does not contest this fact, he vigorously asserts that the written warning was "undeserved" and he explains that Carpenter "had no [c]ompany training on how to perform an objective, impartial[,] and fair investigation." (Pl. 56.1 ¶¶ 12, 11.)

2

That same day, Plaintiff was scheduled to work another shift at the mall. According to Defendant, Plaintiff was scheduled to work from 3:00 p.m. to 11:00 p.m. (*id.* ¶ 16); however, Plaintiff asserts that the shift supervisors had internally "negotiated [that] they would begin their tours 30 minutes prior to the reporting time of security officers[,]" and that he was therefore scheduled to work on June 23, 2015 from 2:30 p.m. to 10:30 p.m. (Pl. 56.1 ¶ 16). Nevertheless, the parties agree that Plaintiff left his post to go change out of his Allied Barton uniform at approximately 10:25 p.m. (Def. 56.1 ¶ 17; Opp. ¶ 27.) At about 10:35 p.m., a large group of individuals gathered in front of the Joe's Crab Shack located in the mall at Bay Plaza. (Def. 56.1 ¶ 18.) Three minutes later, several men exited the Joe's Crab Shack and began arguing with the people gathered outside of the restaurant. (*Id.* ¶ 19; Opp. ¶¶ 20, 29.) One of the men, who appeared to be brandishing a knife, chased the majority of the crowd down the hallway. (*Id.*) Six other men knocked down the security gate to gain entry to the previously secured mall. (Def. 56.1 ¶ 19.) Shift supervisor Abelis Vasquez, who was scheduled to relieve Plaintiff, assisted security officers Pablo Guido and Jason Aljoe in attempting to gain control of the situation. (*Id.* ¶ 20.) In the meantime, Plaintiff returned to his post at the security console wearing shorts and a sweatshirt. (*Id.* ¶ 23.) Security officer Guido contacted Plaintiff via radio to request his supervisor's keys so that Guido could lock the doors to the mall, but Plaintiff did not respond to Guido's request. (*Id.* ¶ 23; Doc. No. 44-2.) The police were then called, at which point Plaintiff changed back into his Allied Barton uniform. (*Id.* ¶ 21.)

Following the incident, Plaintiff's employment was suspended (Doc. No. 46-3 ¶ 16), and Scott Carpenter spoke with shift supervisor Vasquez, security officer Guido, and security officer Mourad Ben Radi about Plaintiff's conduct.[4] (Def. 56.1 ¶¶ 22–24.) On July 3, 2018, Defendant

---

[4] While Defendant asserts that Carpenter also spoke with Plaintiff about the incident, Plaintiff denies that he ever spoke with Carpenter. (Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25.)

3

terminated Plaintiff's employment. (Def. 56.1 ¶ 26.) The fact of, and purported reasons for, Plaintiff's termination were memorialized in a "disciplinary/counseling statement" (the "Disciplinary Statement"). (*See* Opp., Ex. O.) Plaintiff was eventually replaced by Robert Colwell, a Caucasian male under the age of thirty. (Opp. ¶ 65.)

### B. Procedural History

Plaintiff initiated this action by filing a complaint on October 11, 2016, asserting claims against Allied Barton for racial discrimination, age discrimination, and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1976, 29 U.S.C. §§ 621–634 (the "ADEA"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 (the "NYCHRL"). Discovery concluded on August 28, 2017 (*see* Doc. No. 37), and, on September 27, 2017, Defendant filed the instant motion seeking summary judgment (Doc. No. 42). The motion was fully briefed on January 22, 2018. (*See* Doc. Nos. 43, 45, 49, 51, 52, 55.)

The Court will first address Plaintiff's federal law claims before turning to his state and city law claims.

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable factfinder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]'—that is, point[s] out . . . –that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"[B]ecause direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence," courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in cases involving allegations of discrimination. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001). Nonetheless, "[s]ummary judgment is

5

appropriate even in discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Thus, "a plaintiff [in a discrimination case] must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate test remains "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

Additionally, because Plaintiff proceeds *pro se* in this matter, the Court must "read his [submissions] 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). However, "a *pro se* party's 'bald assertion, completely unsupported by evidence' is not sufficient to overcome a motion for summary judgment." *Carmona v. City of New York*, No. 13-cv-3273 (WHP), 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

III. DISCUSSION

A. Federal Claims

On a motion for summary judgment, claims of discrimination and retaliation pursuant Title VII, the ADEA, and Section 1981 are analyzed under the three-step burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 441 U.S. 792 (1973). *See, e.g., Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Davis v. Avaya, Inc.*, 295 F. App'x 380, 381 (2d Cir. 2008).

In the first step of this framework, the employee bears the burden of setting forth evidence sufficient to support a prima facie case of either discrimination or retaliation. *See McDonnell Douglas*, 411 U.S. at 802. To make out a prima facie case for discrimination, a plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for employment in the

position; (3) that she suffered an adverse employment action; and . . . (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation . . . ." *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). Similarly, "[t]o state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (citing *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir. 2004)).

If the plaintiff is able to establish a prima facie case, the burden then "shifts to the defendant to persuade the court by a preponderance of the evidence that legitimate, nondiscriminatory reasons for the challenged employment action existed." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 533 (1993). At this step, however, a defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Finally, if the defendant proffers such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Burdine*, 450 U.S. at 253). Accordingly, to defeat a motion for summary judgment, a plaintiff is required to produce "not simply *some* evidence, but sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (emphasis added, internal quotation marks omitted). In determining whether the articulated reason for the action is a pretext, a court "need

not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993). Moreover, a plaintiff alleging an ADEA violation must prove that "age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.* Similarly, a plaintiff alleging a Title VII retaliation claim must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Here, the Court assumes, without deciding, that Plaintiff can make out a prima facie case of both discrimination and retaliation under federal law. Nevertheless, Defendant has sufficiently stated a legitimate, non-discriminatory reason for Plaintiff's termination – namely, Plaintiff's violations of Allied Barton policy on June 23, 2015 – and Plaintiff has failed to present sufficient evidence to suggest that Defendant's proffered reason was merely a pretext for some discriminatory or retaliatory intent.

1. Legitimate, Non-Discriminatory Reason

As set forth in the Disciplinary Statement memorializing Plaintiff's termination, Defendant asserts that Plaintiff was fired for violating company policy on June 23, 2015, surrounding the incident at Joe's Crab Shack. (Opp., Ex. O.) Specifically, Defendant concluded that Plaintiff abandoned his assigned post before being "properly relieved[,]" was not in uniform, and did not provide "the needed supervision, intervention, and access control (keys) to secure the area." (*Id.*)

8

It is undisputed that such conduct is in violation of company policy. (*See* Opp., Exs. N, M, O.) Indeed, according to the security officer handbook, all Allied Barton security officer are required to be "in proper uniform at all times[,]" and officers are forbidden from leaving their assigned posts "until properly relieved." (Opp, Ex. O.) Accordingly, Defendant's proffered reasons certainly constitute legitimate, non-discriminatory, and non-retaliatory explanations for Plaintiff's termination.

### 2. Pretext

As a result of the evidence put forth by Defendant, the burden shifts back to Plaintiff to produce sufficient evidence of pretext such that a reasonable factfinder could conclude that Defendant's stated reasons were not the real impetus for Plaintiff's termination. Here, Plaintiff challenges many of the factual circumstances surrounding the June 23, 2015 incident at Joe's Crab Shack and asserts that, under his telling of the story, Defendant's proffered explanation for his firing is illegitimate. The Court disagrees.

First, as noted above, Plaintiff contends that he did not leave his post early, because the shift supervisors had internally "negotiated [that] they would begin their tours 30 minutes prior to the reporting time of security officers." (Pl. 56.1 ¶ 16.) From this statement, Plaintiff presumably argues that supervisory shifts also concluded thirty minutes before their scheduled end time. However, Plaintiff never suggests that Scott Carpenter, Alex Diaz, or Defendant generally approved or was even aware of these internal negotiations. Nor does he present any evidence that the shift supervisors had the authority to alter their schedules without Carpenter or Diaz's approval. In fact, Plaintiff admits that company policy prohibits employees from "switching shifts or altering your work schedule without authorization from *your* supervisor or Account Manager." (Doc. No. 46-7 (emphasis added); Pl. 56.1 ¶ 30.) While Plaintiff seems to suggest that this policy did not

apply to him because he "*was* a supervisor" (Pl. 56.1 ¶ 30), the policy clearly requires authorization from the *employee's* supervisor – in this case, either Scott Carpenter or Alex Diaz. Because Plaintiff presents no evidence that Carpenter or Diaz approved the shift supervisors' decision to modify their tours by thirty minutes from the times set forth in the published work schedule (*see* Opp., Ex. K; Doc. No. 46-3 ¶ 12), there can be no doubt that Plaintiff violated company policy when he left his post before 11:00 p.m. on June 23, 2015.

Furthermore, even if the Court were to assume that Carpenter or Diaz knew and approved of the shift supervisors' allegedly negotiated schedule modification, Plaintiff admits that he left his post to go change out of his Allied Barton uniform *before* 10:30 p.m. (Opp. ¶ 27.) Plaintiff asserts that, pursuant to the "New York State Department of Labor" and "New York Sate Law[,]" he was entitled to a "grace period" of at least five minutes to change into his civilian clothes and "get ready" to clock out by "utiliz[ing] the restroom" and "gather[ing] [his] belongings." (Opp. ¶¶ 68–70.) He apparently derives this novel theory from the fact that, pursuant to New York law, employees who work more than eight hours are "entitled to overtime pay." (*Id.* ¶ 68.) But Plaintiff does not explain why the fact that employees who work more than eight hours are entitled to overtime pay necessarily "entails" a grace period that entitles employees to leave their posts early, and the Court declines to read such a grace period into either Defendant's internal policies or the law. Thus, even assuming that Plaintiff's shift properly concluded at 10:30 p.m., the undisputed evidence reveals that Plaintiff violated company policy by leaving his assigned post before then and by failing to be "in proper uniform at all times[.]" (Opp., Ex. O.)

Plaintiff next argues that his conduct was excusable – and, in fact, that he could not have abandoned his post – because shift supervisor Vasquez, who was scheduled to relieve Plaintiff, arrived in the building at 10:15 p.m. (Opp. ¶¶ 24, 71.) However, Plaintiff admits that, as of 10:35

10

p.m., shift supervisor Vasquez had not yet "sign[ed] in to relieve [P]laintiff." (*Id.* ¶ 27.) Thus, shift supervisor Vasquez's mere presence in the mall did not excuse Plaintiff's failure to remain at his assigned post, in uniform, before being properly relieved.

Finally, Plaintiff argues that the incident at Joe's Crab Shack was commonplace and that it did not justify his termination. (*See, e.g., id.* ¶¶ 32–37, 74.) However, even if Plaintiff is correct that Defendant "magnified the incident[,]" that does alter the fact that Plaintiff abandoned his post and failed to remain in uniform until his shift had concluded. (*Id.* ¶ 33.) Accordingly, the undisputed evidence amply demonstrates that the violations described in the Disciplinary Statement did, in fact, occur.

Of course, the fact that Plaintiff violated company policy does not necessarily mean that these violations were the real reason for his firing. But Plaintiff offers scant evidence to suggest that Defendant's stated reasons for terminating his employment were pretextual.

With respect to his discrimination claims, Plaintiff points to the fact that, at the time of his firing, "18 of the 22 employees" assigned to the mall at Bay Plaza were between the ages of twenty and twenty-nine years old, and that Plaintiff "was the only one over 40 that was left visible to the public inside the mall during normal business hours." (Opp. ¶¶ 83, 84.) Plaintiff also notes that Defendant replaced him with a Caucasian male under the age of thirty. (*Id.* ¶ 65.) And finally, Plaintiff alleges that, in a meeting with Scott Carpenter and Alex Diaz in June of 2015, "Scott asked if this mall is too big for [Plaintiff,] inferring racial inferiority[,]" and stated that Plaintiff "sound[s] like an old man[,] reflecting an ageism sentiment." (*Id.* ¶ 48.)

To begin with, Plaintiff's race discrimination claim clearly fails. While the fact that he was replaced by a Caucasian male may be sufficient to establish a prima facie case of discrimination, *see, e.g., Littlejohn*, 795 F.3d at 313 ("The fact that a plaintiff was replaced by someone outside

11

of the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis"), it is insufficient – on its own – to support "a rational finding that the legitimate nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted). And Plaintiff certainly offers no evidence to suggest that Caucasian employees who left their posts or who were out of uniform – or who ignored directives from supervisors – were treated more leniently than their African American counterparts. *See, e.g., Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination.") Moreover, Plaintiff does not explain why Carpenter's question about whether the mall was "too big" for him could be perceived as related to his race.

With respect to Plaintiff's age discrimination claim, Plaintiff bears the greater burden of "offer[ing] evidence that [such] discrimination was the 'but-for' cause of the challenged actions." *Holowecki v. Fed. Express Corp.*, 382 F. App'x 42, 45 (2d Cir. 2010). Indeed, the Supreme Court has explicitly held that the ADEA does not "authorize[] a mixed-motives age discrimination claim." *Gross*, 557 U.S. at 175. Here, Plaintiff fails to meet this heavy burden. Significantly, Plaintiff does not dispute that the security officer handbook explicitly notes that Allied Barton "reserves the right" to terminate an employee for any violation of company policy. (*See* Doc. No. 46-6.) And, as explained above, the undisputed evidence clearly demonstrates that Plaintiff committed the violations of company policy described in the Disciplinary Statement. While Plaintiff does offer some evidence to suggest that Allied Barton may have preferred to hire younger

employees – namely, the fact that the vast majority of Allied Barton employees assigned to the mall at Bay Plaza at the time of Plaintiff's termination were between the ages of twenty and twenty-nine years old, and the fact that Plaintiff was the only employee over age forty "visible to the public inside the mall during normal business hours" (Opp. ¶¶ 83, 84) – Plaintiff has failed to present any evidence that age discrimination was the "but-for" cause of his termination. This is true even assuming, as the Court must, that Carpenter told Plaintiff "on or around June 2015" that he "sound[ed] like an old man" (*Id.* ¶ 48) – a fact that Carpenter vehemently denies (*see* Doc. No. 44 ¶ 17). Indeed, Plaintiff's arguments here resemble ones that were rejected by the Second Circuit in *Fried v. LVI Servs., Inc.*, 500 F. App'x 39 (2d Cir. 2012). In that case, the Second Circuit held that "no reasonable juror could find that LVI's nondiscriminatory reason for terminating Fried was a pretext for age discrimination and that 'but for' Fried's age, he would not have been terminated" in light of "the overwhelming documentary evidence supporting LVI's articulated non-discriminatory reason for terminating Fried." *Id* at 41. This was true even though the plaintiff's job duties were quickly reassigned to nine other board members, all of whom were much younger than him, and the CEO of the company had remarked to the plaintiff, "Burt, you're 71 years of age, how long do you expect to work? What if you're hit by a bus?" less than six weeks prior to terminating his employment. *Id.*; *see also Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 23–24 (2d Cir. 2011) (holding that plaintiff's supervisor's "remark that '[i]t's only fitting that you not get a raise because, after all, you make so much more than some of the younger people on the team[,]'" while "facially age-based[,] . . . was insufficient to allow Timbie to carry her burden in showing that age-discrimination was the 'but-for' cause of Eli Lilly's decisions regarding Timbie's salary and bonus.") Furthermore, Plaintiff once again offers no evidence of disparate treatment or any facts suggesting that older employees were subject to more severe discipline than younger ones

who were found to be in violation of company policy. *See, e.g., Gorzynski*, 596 F.3d at 108 ("[T]he fact that other younger employees were not disciplined for violating numerous policies is both prima facie evidence of discrimination . . . and evidence that the reasons given by JetBlue for firing Gorzynski were pretextual.") Consequently, Plaintiff's age discrimination claims must be dismissed.

Plaintiff presents even less evidence to support his retaliation claim. Specifically, Plaintiff contends that Defendant retaliated against him for calling the "Security Voice Hotline" to lodge a complaint that he had been discriminated against because of his race on June 22, 2015. (*See* Def. 56.1 ¶ 13.) However, Plaintiff only notes the fact of the call itself – he offers no details about what was said or what specific allegations he made about the allegedly race-based termination decision made by Diaz. Without more, the mere timing of Plaintiff's hotline complaint is clearly insufficient to rebut Defendant's proffered reasons for terminating his employment. In fact, the Second Circuit has explicitly held that while a "temporal proximity" between a protected activity and an adverse employment action may be enough to state a prima facie case of retaliation, it "is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext" at stage three of the burden-shifting analysis. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) ("[T]emporal proximity alone is not enough to establish pretext in this Circuit."); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 746 (2d Cir. 2014).

Moreover, as Defendant points out, Plaintiff had already received a number of citations prior to his making the phone call, suggesting that Defendant was dissatisfied with Plaintiff well before June 22, 2015. (*See* Def. 56.1 ¶ 6 (noting that Plaintiff had received "multiple write ups regarding his performance prior to his termination[.]").) Although Plaintiff vigorously disputes

the validity of those prior citations, he does not deny that, on two occasions, a "field inspector" emailed Carpenter with complaints about Plaintiff, and that, on another occasion, a guest at the mall filed a complaint against him. (*See* Pl. 56.1 ¶¶ 6, 7; Doc. No. 46-1 at 113:3–115:12, 118:22–119:23.) Thus, the fact that Plaintiff only called the hotline *after* a series of prior complaints, culminating in Diaz's attempt to terminate Plaintiff's employment during the June 21, 2015 incident at Olive Garden (*see* Def. 56.1 ¶ 10; Pl. 56.1 ¶¶ 9, 10), belies Plaintiff's argument that he was fired in retaliation for his June 22, 2015 phone call. *See, e.g., Warwick Valley Cent. Sch. Dist.*, 586 F. App'x at 746 (holding that, "in light of the persistent concerns with her substantive work performance that prompted [her supervisor], even before any protected activity, to signal that he might well not recommend tenure, plaintiff fails to raise a triable issue of fact that protected activity was a motivating factor in the decision not to award her tenure."); *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 71 (2d Cir. 2015) (plaintiff could not demonstrate pretext because "[n]ot only did [supervisors] develop these opinions about [plaintiff's] conduct before [the protected activity], they also maintained a consistent perspective afterwards.")

In sum, Plaintiff fails to demonstrate, across the board, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Given the ample record supporting Plaintiff's termination, the Court concludes that no reasonable factfinder could determine that the legitimate, non-discriminatory, and non-retaliatory reasons for Plaintiff's termination articulated by Defendant in the Disciplinary Statement were pretextual, and that Plaintiff was in fact fired because of his race, age, or in retaliation for his June 22, 2015 complaint. Accordingly, Plaintiff's Title VII, ADEA, and Section 1981 claims must be dismissed.

B. State and City Law Claims

Having dismissed Plaintiff's federal claims, the Court next considers whether to exercise supplemental jurisdiction over his remaining state and city law claims. *See* 28 U.S.C. § 1367(c)(3) ("[A] district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). As the Second Circuit has instructed, in most cases where all federal claims have been dismissed before trial, "the balance of factors to be considered under the [supplemental] jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."). This is true even when the case has proceeded through discovery and on to summary judgment. *See, e.g., Ziming Shen v. City of New York*, 725 F. App'x 7, 16 (2d Cir. 2018); *Gonzalez v. Micelli Chocolate Mold Co.*, 514 F. App'x 11, 12 (2d Cir. 2013).

1. Plaintiff's NYSHRL Claims

Allegations of race discrimination, age discrimination, and retaliation in violation the NYSHRL are evaluated under the same *McDonnell Douglas* framework as the federal claims at issue here. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) (applying *McDonnell Douglas* to NYSHRL race discrimination claim); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (applying *McDonnell Douglas* to NYSHRL retaliation claim); *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 (2d Cir. 2012) (applying *McDonnell Douglas* to NYSHRL age discrimination claim). Moreover, the Second Circuit has repeatedly

assumed that NYSHRL age discrimination claims are coterminous with the ADEA, including the requirement that a plaintiff prove that age discrimination was a but-for cause of his or her termination. *See, e.g., Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 33 (2d Cir. 2016) ("As the legal standards governing age discrimination claims under the NYSHRL have long been considered to be identical to those under the ADEA, this Court has assumed that 'but-for' causation is required to support a claim under the NYSHRL."); *McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 60 (2d Cir. 2018); *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018); *Mikinberg v. Bemis Co.*, 555 F. App'x 34, 35 (2d Cir. 2014); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106, n.6 (2d Cir. 2010). Accordingly, courts in this circuit frequently analyze a plaintiff's federal and NYSHRL claims together – thus implicitly exercising supplemental jurisdiction over the state claims. *See, e.g., Thelwell v. City of New York*, 733 F. App'x 561, 562 (2d Cir. 2018); *Espinoza v. New York City Dep't of Transportation*, 304 F. Supp. 3d 374, 386 (S.D.N.Y. 2018); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that "courts must analyze NYCHRL claims separately and independently from any federal and state law claims[.]"). And while some courts have declined to exercise supplemental jurisdiction over both NYSHRL and NYCHRL claims after dismissal of all federal claims, those courts have generally not explained their reasons for declining to exercise jurisdiction over a plaintiff's NYSHRL claims. *See, e.g., Harris v. NYU Langone Med. Ctr.*, No. 12-cv-0454 (RA), 2014 WL 941821, at *2 (S.D.N.Y. Mar. 11, 2014), *aff'd*, 615 F. App'x 49 (2d Cir. 2015); *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011).

Here, the Court concludes that, because it has already analyzed all of the facts and law relevant to Plaintiff's NYSHRL claims, the principles of judicial economy, convenience, fairness,

17

and comity all weigh in favor of exercising jurisdiction over those claims. *See Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (explaining that because, "[b]y virtue of resolving Plaintiffs' Title VII claims, the Court ha[d] in fact resolved [plaintiffs'] NYSHRL claims[,] . . . the values of judicial economy, convenience, fairness, and comity favor resolving them now." (internal quotation marks omitted)); *see also Espinoza v. New York City Dep't of Transportation*, 304 F. Supp. 3d 374, 391 (S.D.N.Y. 2018) (exercising jurisdiction over Plaintiff's NYSHRL claims while declining jurisdiction over his NYCHRL claims). Accordingly, the Court will exercise jurisdiction over Plaintiff's NYSHRL claims, and – for the reasons discussed above in the context of Plaintiff's federal claims – dismiss them with prejudice.

2. Plaintiff's NYCHRL Claims

On the other hand, courts in this district "routinely decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL claims after dismissing all federal claims." *Espinoza*, 304 F. Supp. 3d at 391 (collecting cases). Those courts have noted that "comity counsels against exercising jurisdiction over . . . NYCHRL claim[s], as the NYCHRL has a lower threshold of proof than its federal counterparts and has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it." *Harris*, 2014 WL 941821, at *2; *see also Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). In light of this different standard of proof, the Court concludes that the principles of judicial economy, convenience, fairness, and comity weigh against exercising supplemental jurisdiction over Plaintiff's NYCHRL claims. Accordingly, the Court declines to exercise supplemental jurisdiction over those claims and dismisses them without prejudice. *See Vuona*, 919 F. Supp. 2d at 394 (declining to exercise

supplemental jurisdiction over Plaintiff's NYCHRL claim because "the Court ha[d] not yet invested the resources necessary to resolve the NYCHRL claims, which require application of a different standard with which the state courts are more familiar."); *see also Espinoza*, 304 F. Supp. 3d at 391.

V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. IT IS HEREBY ORDERED THAT Plaintiff's Title VII, ADEA, Section 1981, and NYSHRL claims are dismissed with prejudice, and Plaintiff's NYCHRL claims are dismissed without prejudice. Furthermore, because any appeal would "lack[] an arguable basis in law or fact," *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995), the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be undertaken in good faith, and, therefore, Plaintiff may not proceed *in forma pauperis*. The Clerk of Court is respectfully requested to terminate the motion pending at docket number 42, mail a copy of this Opinion and Order to Plaintiff, and close this case.

SO ORDERED.

Dated: September 28, 2018
    New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE